# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **HELICOPTER TRANSPORT SERVICES, LLC,** a Delaware limited liability company, and **U.S. LEASECO, INC.,** a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**SIKORSKY AIRCRAFT CORPORATION,** a New York corporation**,**<br><br>Defendant. | Case No. 3:16-cv-2078-SI<br><br>**OPINION AND ORDER** |

Scott G. Seidman, Ryan M. Bledsoe, and Sarah Einowski, TONKON TORP LLP, 1600 Pioneer Tower, 888 SW Fifth Avenue, Portland, OR 97204. Of Attorneys for Plaintiffs.

Jonathan M. Hoffman and Michael A. Yoshida, MB LAW GROUP LLP, 117 SW Taylor Street, Suite 200, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs Helicopter Transport Services, LLC ("HTS") and U.S. Leaseco, Inc.

("Leaseco") bring this action against Defendant Sikorsky Aircraft Corporation ("Sikorsky"),

alleging breach of contract and breach of the implied warranties of merchantability and fitness

for a particular purpose. Before the Court is Defendant's motion to dismiss for lack of personal jurisdiction. For the reasons stated below, Defendant's motion is DENIED.

## STANDARDS

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

When the court's determination is based on written materials rather than after an evidentiary hearing, "the plaintiff need only make a *prima facie* showing of jurisdictional facts."[1] *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990) (emphasis added). "[T]he plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). Although a plaintiff may not rest solely on bare allegations in the complaint, uncontroverted allegations must be taken as true. *Schwarzenegger*, 374 F.3d at 800. The court, however, may not assume the truth of such allegations if they are contradicted by affidavit. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977). Further, conflicts among the parties over statements contained in affidavits must be resolved in favor of the plaintiff. *Schwarzenegger*, 374 F.3d at 800.

---

[1] Written materials may include pleadings, declarations, affidavits, deposition testimony, and exhibits. *See Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 268 (9th Cir. 1995).

# BACKGROUND

## A.  The Plaintiffs

Plaintiff HTS is a Delaware limited liability company with its principal place of business in Aurora, Oregon. Plaintiff Leaseco is a Delaware corporation with its principal place of business in Aurora, Oregon. Leaseco and HTS are the registered owner and lessee, respectively, of a Sikorsky S-61R model, commercial heavy-lift helicopter, serial number 61501, bearing the Federal Aviation Administration ("FAA") registration N664Y (the "Helicopter"). On October 30, 2012, the FAA grounded the Helicopter. Complaint ("Compl.") ¶ 12. Plaintiffs have been unable to fly the Helicopter ever since. *Id.* ¶ 15.

## B.  The Defendant

Defendant Sikorsky makes helicopters and manufactured the Helicopter at issue in this lawsuit. Sikorsky is a New York corporation with its principal place of business in Stratford, Connecticut. The S-61R Helicopter at issue is a member of the S-61 family of heavy-lift helicopters made by Sikorsky. Declaration of Mark Pilon ("Pilon Decl.") ¶ 18. There are only two S-61R helicopters. One is owned by Plaintiff HTS. The other was owed by Carson Helicopters ("Carson") in Oregon. Pilon Decl. ¶ 19. Sikorsky manufactured the Helicopter at issue in 1963 and operated it until 1970, when Sikorsky sold that Helicopter to Carson. Declaration of Nancy Marcho ("Marcho Decl.") ¶ 4. Sikorsky produced the last S-61 helicopter in 1980. *Id.* ¶ 6. The last time that Sikorsky sold a new S-61 helicopter to a customer in Oregon was at least 35 years ago. *Id.* ¶ 12.

Because of timber industry and firefighting needs in the west, the majority of the civilian, heavy-lift helicopter industry is concentrated in Oregon. Pilon Decl. ¶ 7. Oregon is home to a number of commercial helicopter operators that fly Sikorsky helicopters. Compl. ¶ 3. Both Columbia Helicopters, Inc. ("Columbia") and Erickson Incorporated ("Erickson") are Oregon-

based companies that purchase and use helicopters in Oregon and elsewhere. Declaration of Sarah Einowski ("Einowski Decl."), Exs. 6, 7. Sikorsky conducted business with Columbia beginning in 1967 and with Erickson in approximately 1970. *Id.* Sikorsky actively supports the heavy-lift helicopter industry in Oregon. Pilon Decl. ¶ 7. Sikorsky has sent advertising materials to Plaintiff HTS in Oregon and also advertises in magazines that are sent to Oregon. Pilon Decl. ¶ 14. Sikorsky also has a Fleet Technical Services Help Desk, through which Sikorsky provides engineering services to the operators of its helicopters. Pilon Decl. ¶ 13.

Sikorsky does not design or manufacture any products in Oregon, does not own any land or real property in Oregon, does not maintain any offices in Oregon, and is not registered to conduct business in Oregon. Marcho Decl. ¶¶ 8-10. In addition, Sikorsky does not directly contract with any dealers, retailers, or distributors located in Oregon for the sale of helicopters, and it has no direct employees who regularly work in Oregon. *Id.* ¶¶ 10-11.

Sikorsky Commercial Services, Inc. ("SCS") is a wholly-owned subsidiary of Sikorsky. Declaration of William Ryall ("Ryall Decl.") ¶¶ 4-5; Einowski Decl., Ex. 5 ¶ 2. In 1998, Sikorsky acquired Helicopter Support, Inc. ("HSI"). Ryall Decl. ¶ 4. In January 2015, HSI changed its name to "Sikorsky Commercial Services, Inc." Ryall Decl. ¶ 5. (For convenience, the Court will refer to HSI simply as "SCS.")

Sikorsky itself does not sell commercial replacement helicopter parts; instead, they replacement parts are sold by SCS. Ryall Decl. ¶ 3. SCS also provides dedicated logistical support and repair services and maintains a comprehensive inventory of replacement helicopter parts. Einowski Decl., Ex. 5 ¶ 63. As of 2007, SCS (then known as "HSI") maintained more than 100,000 parts in inventory and serviced more than 900 customers in 56 countries. Einowski

Decl., Ex. 5 ¶ 63. SCS also provides factory authorized services for Sikorsky's S-61 helicopters. *Id*. ¶ 64.

The only reliable sources for replacement parts for Sikorsky helicopters are Sikorsky and its direct subsidiaries, including SCS. Pilon Decl. ¶ 15; Ryall Decl. ¶ 3. Sikorsky maintains an interactive website to allow businesses and consumers to coordinate with Sikorsky and order parts and technical support services online. Pilon Decl. ¶ 16; Einowski Decl., Ex. 5. Plaintiff HTS has a Sikorsky-assigned customer code and login ID for Sikorsky's portal so that HTS can order replacement parts. Pilon Decl. ¶ 16. Sikorsky also has a second website, www.sikorsky360.com, that makes Sikorsky's technical manuals available to owners and operators with a valid login and registration. *Id*. ¶ 17. HTS pays Sikorsky an annual subscription fee for this service. *Id*.

William Ryall ("Ryall") is employed by SCS as the "Aftermarket Program Manager"; he works in Connecticut. Ryall Decl. ¶ 1. Gary Tate ("Tate") works as a contractor for SCS; his title is "Field Service Representative." Declaration of Gary Tate ("Tate Decl.") ¶ 1. Sikorsky tells its customers that the Field Service Representative is the owner or operator's "first point of contact" for Sikorsky's "localized support services." Einowski Decl., Ex. 3 at 2. Tate holds himself out as the "[d]irect technical liaison between Sikorsky and Sikorsky's customers." Einowski Decl., Ex. 2 at 1.

Tate lives in British Columbia, Canada. Tate Decl. ¶ 4. The territory for which Tate provides field services consists of Canada, the West Coast of the United States, and Greenland. *Id*. ¶ 3. Tate is not a salesman and does not take sales orders or promote or solicit the sale of Sikorsky products. *Id*. ¶ 8. Instead, Tate's job as a Field Service Representative "is to provide technical assistance to resolve difficult or unusual maintenance problems and to serve as a

technical liaison between Sikorsky and its customers." *Id*. ¶ 7. Tate does not ordinarily meet operators of Sikorsky helicopters in person in the United States; instead, he typically responds to them by telephone, email, or occasionally fax. *Id.* ¶ 11.

In addition, if an owner or operator of a Sikorsky helicopter calls Tate in an effort to locate a replacement part that is no longer manufactured by Sikorsky or sold by SCS, Tate makes telephone calls to other owners and operators to see if anyone has the needed replacement part available. Tate Decl. ¶ 9. If so, Tate will pass along that information to the person who originally contacted him. *Id.* The services that Tate provides are free of charge to owners and operators of Sikorsky helicopters. Tate Decl. ¶ 13.

Tate and others at Sikorsky or SCS provide HTS with the information necessary to maintain and repair its Sikorsky helicopters. Pilon Decl. ¶ 9; Tate Decl. ¶ 1, 7. Tate also periodically sends to HTS in Oregon safety bulletins and other relevant information. Pilon Decl. ¶ 10. In addition, Sikorsky, through Tate, periodically requests information from HTS in Oregon about the operation of HTS's Sikorsky-manufactured helicopters, and Sikorsky uses this information to update its protocols for maintenance, repair, and overhaul. *Id*. ¶¶ 5, 11. Tate keeps HTS advised about his general availability. *Id*. ¶ 12. During the past five years, Tate has "received six requests for technical assistance" from Plaintiff HTS, "two of which appear to relate to the main gearbox (MGB)" issue that is at the center of this lawsuit. Tate Decl. ¶ 14. Tate "attempted to assist HTS in response" to its request. *Id*. at ¶ 15.

## C. The Problem

Plaintiffs allege that when Leaseco purchased the Helicopter from a third party, Leaseco became a successor-in-interest to Sikorsky's contractual and implied warranty obligations owed to owner-operators of Sikorsky's S-61R helicopters. Compl. ¶ 18. Plaintiffs further allege that Sikorsky breached those obligations by failing to manage the Helicopter's type certificate

("TC")[2] "in such a way so that Plaintiffs could maintain the N664Y Helicopter to conform to the TC and keep the helicopter airworthy." Compl. ¶ 19. According to Plaintiffs, as a direct and foreseeable result of Sikorsky's breach, the Helicopter has been grounded since 2012, causing HTS damages in the form of lost profits, unnecessary costs, and lost value. *Id.* ¶¶ 21-23.

From January 3, 1972, until October 2012, based on direct advice from Sikorsky, a model number S6137-23000-013 MGB was installed in the Helicopter at issue. In 1982, Sikorsky itself removed a -013 MGB and replaced it with another -013 MGB. In the fall of 2012, the Helicopter needed a new MGB. HTS hired RotorMaxx to perform this work. Sikorsky employee Robert F. Bellone advised HTS that MGB models -013 through -019 all conformed to the type certificate and would, therefore, be acceptable to install in the Helicopter. Based on Sikorsky's advice, because no other -013 MGB was available, HTS installed a -019 MGB. Shortly after the new MGB was installed, however, the Helicopter underwent a routine inspection by the FAA office in Hillsboro, Oregon. Pilon Decl. ¶¶ 22-25.

The FAA office in Oregon raised concerns regarding, among other issues, the new MGB. HTS contacted Tate, who replied that he would be speaking with the FAA's office in Hillsboro, Oregon. On November 2, 2012, Sikorsky again assured HTS that the correct MGB had been installed, that Sikorsky would draft a letter confirming this, and that HTS could forward the letter to the FAA in Hillsboro. HTS sent this letter, with Mr. Bellone's consent, to the FAA in Hillsboro. Despite this letter, a week later, HTS learned that Sikorsky had informed the Boston

---

[2] According to Plaintiffs, "[t]he FAA requires all aircraft models to have a TC to be authorized to operate for civilian purposes. The TC sets out the requirements or the references to documents for an aircraft to meet that FAA approved manufacturing design. Once issued, the design can be changed through an application for a supplemental type certificate ("STC") or by amending the TC." Compl. ¶ 9. *See also Nat. Gas Pipeline Co. of Am. v. United States*, 742 F.2d 502, 504 (9th Cir. 1984) (discussing the type certification application and issuance process).

Aircraft Certification Office ("ACO") of the FAA that only -017 and -018 MGBs could be installed on the S-61R Helicopter.

Under the FAA's structure, the ACO manages type certificates based on geography. Because Sikorsky is in Connecticut, the Boston ACO office has jurisdiction over Sikorsky's type certification, and all information must go through that office. The Boston ACO amended the S-61 type certificate to reflect this newly disclosed information from Sikorsky. The Boston ACO, based on the information it received from Sikorsky, informed the FAA in Hillsboro, Oregon that only the -017 and -018 model MGBs were approved for the S-61R. Relying on Sikorsky's advice to the Boston ACO, the FAA ordered the Helicopter grounded until a conforming MGB could be installed. According to Plaintiffs, there are no -017 or -018 MGBs being manufactured or otherwise available to install on the Helicopter, and there is no complete set of technical specifications or blueprints from which a -017 or -018 MGB could be made. Thus, because -017 and -018 MGBs are not available, the Helicopter at issue "will likely be grounded indefinitely." Pilon Decl. ¶¶ 25-31.

## DISCUSSION

### A. Personal Jurisdiction: General and Specific

Unless a federal statute governs personal jurisdiction, a district court applies the personal jurisdiction law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Oregon's long-arm statute for personal jurisdiction is found in Rule 4 of the Oregon Rules of Civil Procedure ("ORCP"). ORCP 4A-4K provide specific bases of personal jurisdiction, and ORCP 4L is Oregon's "catch-all" provision. Regardless of which Oregon rule serves as the basis for jurisdiction, "the limit on an Oregon court's exercise of personal jurisdiction over a defendant is the same—federal due process." *Swank v. Terex Utils., Inc.*, 274 Or. App. 47, 57 (2015). Thus,

for jurisdiction to be proper under Oregon law, it also must not offend federal constitutional due process requirements. *See Boschetto*, 539 F.3d at 1015.

Due process requires that a defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The Supreme Court has rejected the application of "mechanical" tests to determine personal jurisdiction. *Id.* at 319; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Rather, a court should consider the "quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *Int'l Shoe*, 326 U.S. at 319.

"There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant—general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. A court has general personal jurisdiction over a defendant whose contacts with the forum are "continuous and systematic," even if those contacts are wholly unrelated to the plaintiff's claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). If the court lacks general personal jurisdiction, it may have specific (also known as "limited") personal jurisdiction if the defendant has certain minimum contacts with the forum state, the controversy arose out of those contacts, and the exercise of jurisdiction is reasonable. *See Burger King*, 471 U.S. at 472-74.

The Ninth Circuit applies a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant is appropriate:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully

> avails himself of the privilege of conducting activities in the
> forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the
> defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and
> substantial justice, i.e. it must be reasonable.

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden as to the first two prongs, but if both are established, then "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802). "[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed." *Id.*

The first prong embodies two distinct, although sometimes conflated, concepts known as "purposeful availment" and "purposeful direction." *See Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672-73 (9th Cir. 2012); *Brayton Purcell*, 606 F.3d at 1128. "A purposeful availment analysis is most often used in suits sounding in contract. A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted).

Sikorsky moves to dismiss Plaintiffs' lawsuit for lack of personal jurisdiction in the District of Oregon. Although Plaintiffs originally alleged in their Complaint that Sikorsky is subject to both general and specific personal jurisdiction in this district, Compl. ¶ 5, Plaintiffs now rely only on a theory of specific jurisdiction. Declaration of Jonathan M. Hoffman ("Hoffman Decl.") at ¶ 3. Accordingly, the Court only evaluates the question of whether there is specific personal jurisdiction in this district over Sikorsky. Further, because Plaintiffs allege in

their Complaint only claims of breach of contract and breach of implied warranties, the Court applies the purposeful availment standard, rather than the purposeful direction test.

**B. Forum Contacts of a Defendant's Agent in Specific Jurisdiction Cases**

During oral argument, Plaintiffs cited the Ninth Circuit's decision in *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001), for the proposition that a court may consider the forum contacts of a defendant's agent when evaluating specific jurisdiction. Neither side mentioned this case in their pre-hearing memoranda. The Court, however, allowed supplemental briefing from both sides and now addresses this issue. In *Unocal*, Burmese citizens brought a putative class action against a United States oil company and a French corporation. The French company moved to dismiss for lack of personal jurisdiction. The district court granted the motion, finding neither general nor specific jurisdiction. The Ninth Circuit affirmed, adopting as its own a portion of the district court's opinion. *Unocal*, 248 F.3d at 920-21.

In the adopted portion of the district court's opinion that discussed *general* jurisdiction, the district court noted that "[t]he existence of a relationship between a parent company and its subsidiaries is not sufficient to establish personal jurisdiction over the parent on the basis of the subsidiaries' minimum contacts with the forum." *Id*. at 925. The district court added, however, that "'if the parent and subsidiary are not really separate entities, or one acts as an agent of the other, the local subsidiary's contacts with the forum may be imputed to the foreign parent corporation.'" *Id*. at 926 (quoting *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)). The district court proceeded to discuss both the alter ego doctrine and principles of agency.

Regarding agency, the district court noted: "The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to

perform them, the corporation's own officials would undertake to perform substantially similar services.'" *Id*. at 928 (quoting *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994)). Notwithstanding this discussion, the district court in *Unocal* found both general and specific jurisdiction lacking. As already noted, the Ninth Circuit affirmed.

Nevertheless, at oral argument in the pending case Plaintiffs referred to the agency discussion in *Unocal* in support of Plaintiffs' argument for *specific* jurisdiction over Sikorsky—even though *Unocal's* discussion about agency appeared only in that court's analysis of *general* jurisdiction. In Defendant Sikorsky's Supplemental Memorandum in Support of Motion to Dismiss (ECF 23), filed after the hearing, Sikorsky correctly observes that in *Daimler AG v. Bauman*, 134 S.Ct. 746 (2014), the United States Supreme Court rejected the same agency analysis relied upon in *Unocal*. In *Daimler*, the Supreme Court stated:

> The Ninth Circuit's agency finding rested primarily on its observation that MBUSA's services were "important" to Daimler, as gauged by Daimler's hypothetical readiness to perform those services itself if MBUSA did not exist. Formulated this way, the inquiry into importance stacks the deck, for it will always yield a pro-jurisdiction answer: "Anything a corporation does through an independent contractor, subsidiary, or distributor is presumably something that the corporation would do 'by other means' if the independent contractor, subsidiary, or distributor did not exist." [*Bauman v. DaimlerChrysler Corp.*, 676 F.3d 774, 777 (9th Cir. 2011)] (O'Scannlain, J., dissenting from denial of rehearing en banc). The Ninth Circuit's agency theory thus appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the "sprawling view of general jurisdiction" we rejected in *Goodyear* [*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929 (2011)].

*Daimler*, 134 S. Ct. at 759-60 (footnote omitted). Sikorsky adds that the Ninth Circuit later acknowledged the overruling of *Unocal's* agency analysis.

In *Ranza v. Nike, Inc*., the Ninth Circuit stated:

Before the Supreme Court's *Daimler* decision, this circuit permitted a plaintiff to pierce the corporate veil for jurisdictional purposes and attribute a local entity's contacts to its out-of-state affiliate under one of two separate tests: the "agency" test and the "alter ego" test. *See Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011), *rev'd sub nom. Daimler AG v. Bauman*, 134 S.Ct. 746 (2014). The agency test required a plaintiff to show the subsidiary "perform[ed] services that [were] sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* (quoting *Unocal*, 248 F.3d at 928). The Supreme Court invalidated this test. *See Daimler*, 134 S.Ct. at 759. It held that focusing on whether the subsidiary performs "important" work the parent would have to do itself if the subsidiary did not exist "stacks the deck, for it will always yield a pro-jurisdiction answer." *Id.* Such a theory, the Court concluded, sweeps too broadly to comport with the requirements of due process. *See id.* at 759-60. The agency test is therefore no longer available to Ranza to establish jurisdiction over NEON.

793 F.3d 1059, 1071 (9th Cir. 2015). Although *Ranza* involved only the assertion of general jurisdiction, and not specific jurisdiction, 793 F.3d at 1069, Sikorsky urges that the same "stack the deck" reasoning that the Supreme Court discussed in *Daimler* also should apply in the context of specific jurisdiction.

Sikorsky also quotes from the Supreme Court's decision in *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (holding that "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State" (quoting *Burger King*, 471 U.S. at 475)). Sikorsky notes that both *Walden* and *Burger King* were specific jurisdiction cases. Neither *Walden* nor *Burger King*, however, addressed the agency issue that was analyzed in *Daimler*. Thus, neither case sheds much light on the question of whether an agent's forum contacts are relevant in a specific jurisdiction case.

In Plaintiffs' Response to Defendant's Supplemental Memorandum (ECF 24), Plaintiffs acknowledge that after *Unocal*, it is established that an agent's contacts with the forum state are

irrelevant to a federal court's analysis of *general* jurisdiction. Citing *Daimler*, Plaintiffs agree

that a company is not "at home" in a state merely because one or more of its agents are acting in

that state. *Daimler*, 134 S.Ct. at 769 (Sotomayor, J., concurring in the judgment). Nevertheless,

Plaintiffs argue that Sikorsky's reliance on *Daimler* is misplaced.[3]

    The Supreme Court in *Daimler* made clear that an agent's contacts with the forum state

are relevant to the analysis of *specific* jurisdiction. *Daimler* only overruled *Unocal* with respect

to the relevance of an agent's contacts for purposes of analyzing *general* jurisdiction. In *Daimler*,

the Supreme Court expressly limited its holding to *general* jurisdiction cases and reaffirmed

longstanding case law reaching a contrary result in *specific* jurisdiction cases. In footnote 13 of

*Daimler*, the Supreme Court stated:

> Agency relationships, we have recognized, may be relevant to the
> existence of specific jurisdiction. "[T]he corporate personality,"
> *International Shoe Co. v. Washington*, 326 U.S. 310 . . . (1945),
> observed, "is a fiction, although a fiction intended to be acted upon
> as though it were a fact." *Id.*, at 316. *See generally* 1 W. Fletcher,
> Cyclopedia of the Law of Corporations § 30, p. 30 (Supp. 2012-
> 2013) ("A corporation is a distinct legal entity that can act only
> through its agents."). ***As such, a corporation can purposefully
> avail itself of a forum by directing its agents or distributors to
> take action there.*** *See, e.g.*, *Asahi* [*Metal Indus. Co. v. Superior
> Court of Cal., Solano Cty.*], 480 U.S. [102,] 112 . . . [(1987)]
> (opinion of O'Connor, J.) (defendant's act of "marketing [a]
> product through a distributor who has agreed to serve as the sales
> agent in the forum State" may amount to purposeful availment);
> *International Shoe*, 326 U.S., at 318 ("the commission of some
> single or occasional acts of the corporate agent in a state" may
> sometimes "be deemed sufficient to render the corporation liable to
> suit" on related claims). *See also* Brief for Petitioner 24
> (acknowledging that "an agency relationship may be sufficient in
> some circumstances to give rise to *specific* jurisdiction"). It does

---

[3] Sikorsky objects to Plaintiffs' response, including Plaintiffs' discussion of *Daimler's*
comments regarding agency. ECF 25. Sikorsky's objection is overruled. Plaintiffs' response
merely distinguishes Sikorsky's discussion of *Daimler*. Both sides have had a full and fair
opportunity to present their respective views on this subject.

not inevitably follow, however, that similar reasoning applies to *general* jurisdiction. *Cf. Goodyear*, 564 U.S., at \_\_\_\_, 131 S. Ct., at 2855 (faulting analysis that "elided the essential difference between case-specific and all-purpose (general) jurisdiction").

*Daimler*, 134 S. Ct. at 759 n.13 (emphasis added).[4]

## C. Purposeful Availment

### 1. Purposeful Availment Generally

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Boschetto*, 539 F.3d at 1016 (quoting *Sher*, 911 F.2d at 1362). In cases involving contractual obligations, the Supreme Court emphasizes "the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316-17 (1943)). The court's review of the contractual relationship must be "practical and pragmatic." *Boschetto*, 539 F.3d at 1016. A court should consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" in determining whether the defendant purposefully established minimum contacts within the forum. *Burger King*, 471 U.S. at 479.

---

[4] Sikorsky also calls the Court's attention to contrary comments in *Moore v. Gulf Atlantic Packaging Corp.*, 2016 WL 8231142, at *12 (D. Or. Nov. 29, 2016), *report and recommendation adopted*, 2017 WL 540051 (D. Or. Feb. 9, 2017). The Magistrate Judge in that case, however, did not address footnote 13 from *Daimler*. Similarly, when the undersigned adopted the report and recommendation of the Magistrate Judge, the undersigned also did not focus on footnote 13. In light of *Daimler's* footnote 13, this Court now rejects this portion of the analysis in *Moore*.

An "individual's contract with an out-of-state party *alone*" cannot "automatically establish sufficient minimum contacts in the other party's home forum." *Burger King*, 471 U.S. at 478. Parties to an interstate contract who "'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)). This continuing relationship must create a "'substantial connection,'" *id.* at 479 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)), between the defendant and the forum state that is more than merely "'random,' 'fortuitous,' or 'attenuated.'" *Id.* at 479-80 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

"[I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden*, 134 S. Ct. at 1122. A defendant's contacts with the forum, however, "may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 1123. "Due process requires that a defendant be haled into a court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King*, 471 U.S. at 475).

A defendant whose interstate contract contemplates "significant future consequences" or "continuing and wide-reaching contacts" in another state has the requisite continuing relationship with the parties to the contract in that state. *Id.* at 1122; *see also Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991). Similarly, a defendant who created continuing obligations to residents of another state has satisfied the "purposeful availment" requirement. *Ballard*, 65 F.3d

at 1498. Conversely, a continuing relationship is not established by a "one-time contract for the sale of a good that involved the forum state only because that is where the purchaser happened to reside, but otherwise created no substantial connection or ongoing obligations there." *Boschetto*, 539 F.3d at 1019 (quoting *McGee*, 355 U.S. at 223). Finally, as previously discussed, the Supreme Court explained in *Daimler* that "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler*, 134 S.Ct. at 759 n.13.

### 2. Purposeful Availment Applied

The Court begins its analysis with the well-established rule applicable in cases asserting specific personal jurisdiction: "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler*, 134 S.Ct. at 759 n.13. The Court then focuses on the actions of Defendant's agent, its wholly-owned subsidiary SCS. Indeed, but for the actions of SCS, the conduct of Sikorsky by itself would be insufficient to establish specific personal jurisdiction.

As discussed, SCS sells commercial replacement helicopter parts throughout the world, including in Oregon. SCS maintains a comprehensive inventory of replacement helicopter parts, and the only reliable source for replacement parts for Sikorsky helicopters is SCS. Moreover, Sikorsky has sent advertising materials to HTS in Oregon and has advertised in magazines sent to Oregon. Thus, Sikorsky and SCS market to and serve customers in Oregon with replacement parts and other forms of technical assistance.

SCS and Sikorsky also provide dedicated logistical support and repair services. Sikorsky tells its customers that the Field Service Representative is the owner or operator's first point of contact for Sikorsky's localized support services, and Tate holds himself out as the direct technical liaison between Sikorsky and Sikorsky's customers. Tate, although a contractor for SCS, is Sikorsky's resource available to HTS with information necessary to maintain and repair

its Sikorsky helicopters and for resolving difficult or unusual maintenance problems. During the past five years, HTS has communicated with Tate six times, two of which involve the MGB at issue in this lawsuit, and Tate attempted to assist HTS in response.

Further, Sikorsky maintains an interactive website to allow businesses and consumers to coordinate with Sikorsky and order parts from SCS and to receive technical support services online. Plaintiff HTS has a Sikorsky-assigned customer code and login ID for Sikorsky's portal so that HTS can order replacement parts from SCS. Sikorsky also has a second website that makes its technical manuals available to owners and operators with a valid login and registration, and HTS pays Sikorsky an annual subscription fee for this service.

In addition, the Ninth Circuit applies a "sliding scale analysis" that looks to how interactive an Internet website is for purposes of determining its jurisdictional effect. *Boschetto*, 539 F.3d at 1018. The likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet. *Cybersell, Inc. v. Cybersell, Inc*., 130 F.3d 414, 419 (9th Cir. 1997). Plaintiffs argue that Sikorsky's websites are highly interactive because they require individualized login and registration information to access. Because the majority of the civilian, heavy-lift helicopter industry is concentrated in Oregon, Sikorsky, including SCS, must know that its customers who use its web portals are doing so from Oregon.

As the Ninth Circuit has explained, "[t]o have purposefully availed itself of the privilege of doing business in the forum, a defendant must have 'performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.'" *Boschetto*, 539 F.3d at 1016 (quoting *Sher*, 911 F.2d at 1362). By selling replacement parts and providing technical assistance to customers in Oregon, Sikorsky (at least through SCS) promotes

the transaction of business within the forum state. In addition, the Supreme Court, in a case asserting specific personal jurisdiction, directs courts to conduct "a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'" *Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning*, 318 U.S. at 316-17). For Sikorsky, after the helicopter is sold, the real object of the business transaction becomes the sale of replacement parts and related services and technical advice.

*Walden* does not require a finding of no personal jurisdiction over Sikorsky. The defendants in *Walden* "never traveled to, conducted activities within, contacted anyone in, or sent anything to anyone" in the forum state. *Walden*, 134 S. Ct. at 1124. Here, Sikorsky itself and through SCS has had significant contacts with Oregon. It has a longstanding business relationship with many businesses in Oregon, contacts HTS and other businesses in Oregon, and sends parts, information, advice, and advertisements to Oregon, including advice to HTS and the FAA in Oregon relating to the MGB at issue in this lawsuit. As the Supreme Court noted in *Walden*, the critical inquiry is looking at the defendant's contacts with the forum state to ensure jurisdiction is "based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 1123. There is nothing random or fortuitous about Sikorsky's connections with Oregon. Further, Oregon has several heavy-lift helicopter companies, and Sikorsky targets those companies in this forum to do business. Thus, Sikorsky's "conduct connects [it] to the forum in a meaningful way." *Id.* at 1125.

To find otherwise would allow a company to solicit business in a foreign state, maintain longstanding business relationships and obligations, and engage in many telephone calls and

email communications directed to the forum state in furtherance of those business relationships, but then avoid personal jurisdiction simply by hiring an agent who is out-of-state and who does not travel to the forum. "[P]hysical entry is not a prerequisite to jurisdiction." *Id.* at 1122. The Court will not "entirely negate the otherwise permissible exercise of jurisdiction over defendants who purposefully directed their activities at a forum state without entering the state." *Leibman v. Prupes*, 2015 WL 898454, at *10 (C.D. Cal. Mar. 2, 2015).

Moreover, the Court looks to Oregon law of personal jurisdiction. The Oregon Court of Appeals considered ORCP 4D and found personal jurisdiction where the defendant had fewer contacts with Oregon than does Sikorsky. *Swank*, 274 Or. App. 47. Although the case involved personal jurisdiction under ORCP 4D, the court expressly noted that ORCP 4D, like ORCP 4L and all of its other provisions, are subject to federal due process limitations on personal jurisdiction. *Id.* at 57. Thus, the Oregon Court of Appeals necessarily found that the level of contacts involved did not offend federal constitutional due process requirements.

The defendant in *Swank*, Manitex, was the owner of a line of cranes. *Id.* at 51. There were 14 such cranes in Oregon, although none of them had been purchased directly from Manitex. *Id.* Manitex discovered a problem with the cranes and sent a bulletin to all known crane owners discussing the defect. *Id.* at 51-52. Approximately 18 months later, Manitex sent out a second bulletin discussing kits for retrofitting the cranes. *Id.* at 52. One crane owner had sold its crane to an Oregon company, ES&A. After receipt of the second bulletin, the original crane owner forwarded both bulletins to ES&A. *Id.* at 53. ES&A reached out to Manitex by email and facsimile, asking about the crane defects and retrofitting, but Manitex did not respond. *Id.* The plaintiff was injured in an accident involving ES&A's crane. After the accident, Manitex began communicating with ES&A. *Id.*

Manitex argued that Oregon courts did not have personal jurisdiction over it because Manitex had never made contact with any Oregon company, had never directed any activity to an Oregon resident, did not solicit business from ES&A, did not attempt to solicit business from any Oregon customer, and there was no basis on which Manitex could anticipate being haled into Court in Oregon. *Id.* at 63. The Oregon Court of Appeals rejected these arguments.

The court found personal jurisdiction under ORCP 4D.[5] *Id.* at 65. The court held that because Manitex had engaged in a "field campaign" relating to the cranes, that constituted "service" as that term is used in ORCP 4D. *Id.* at 64. Thus, the court concluded that because Manitex engaged in a campaign designed to reach all crane owners, it targeted the forums in which those crane owners resided, including Oregon, and it "was not through fortuity that Manitex had contact with Oregon." *Id.* at 64.

Similarly, Sikorsky reaches out to the heavy lift helicopter owners and operators in Oregon, including HTS. Sikorsky (including SCS) solicits business with them through its interactive website for parts ordering and through its website providing an annual subscription service for its technical manuals. It provides ongoing services, including advice and information relating to repair and maintenance of the helicopters. And unlike Manitex, Sikorsky (including SCS) directly contacts HTS and other Oregon business through advertising, email, and telephone

---

[5] ORCP 4D provides jurisdiction for foreign acts that cause in-state injury to person or property, based on tort or contract, when either the acts giving rise to the injury occurred in Oregon or the injury took place in Oregon and either: (1) solicitation or service activities were carried on within Oregon by or on behalf of the defendant; or (2) products, materials, or things distributed, processed, services, or manufactured by the defendant were used or consumed within this state in the ordinary course of trade. ORCP 4D; *see also Swank*, 274 Or. App. at 57 (quoting Comment to Rule 4, Final Rule, Oregon R. of Civ. P., Council on Court Procedures, Dec. 2, 1978, at 12 (Comment to Rule 4)).

communications, which more strongly supports a finding of personal jurisdiction than does the limited and indirect contacts in *Swank*.

As the court noted in *Swank*, in considering personal jurisdiction a court is not concerned with whether a plaintiff's claim has any merit, but only with whether the circumstances of the claim fall within the requirements for personal jurisdiction. *Id.* at 59. Based on the facts presented, Plaintiffs have met their burden at step one of the three-part test used in cases asserting specific jurisdiction. *See Brayton Purcell*, 606 F.3d at 1128.

## D. Step Two: Arising Out of or Relating to Contacts with the Forum State

The Ninth Circuit relies "on a 'but for' test to determine whether a particular claim arises out of forum-related activities and thereby satisfies the second requirement for specific jurisdiction." *Ballard*, 65 F.3d at 1500. Thus, the relevant question is: but for Sikorsky's contacts with Oregon (including SCS's contacts with Oregon because SCS is Sikorsky's agent), would Plaintiffs' claims have arisen?[6]

Sikorsky argues that Plaintiffs allege breaches of contract and implied warranties consisting of failing to "manage the aircraft's Type Certificate to allow Plaintiffs to conform the helicopter to an FAA-approved configuration or type design to ensure its airworthiness," failing

---

[6] The Oregon Supreme Court has adopted a combined "but for" and "reasonably foreseeable" standard for personal jurisdiction under ORCP 4L. *See Robinson v. Harley-Davidson Motor Co.*, 354 Or. 572, 594 (2013). The court in *Robinson* rejected the "but-for" test as "overinclusive." *Id.* at 589. The court instead added the requirement at step two that for the litigation to "arise out of or relate to" at least one of the forum activities, the activity "must be a but-for cause of the litigation and provide a basis for an objective determination that the litigation was reasonably foreseeable." *Id.* at 594. The Court does not address the implications, if any, between Oregon adopting a different test from the Ninth Circuit's test because the Court finds that the litigation was a reasonably foreseeable consequence of Sikorsky's conduct in advising Plaintiffs that it could install the -019 MGB, in providing a letter for Plaintiffs to forward to the FAA in Oregon, stating that Plaintiffs could install the -019 MGB. Sikorsky then told the FAA that the Helicopter could not use the -019 MGB that was installed. Thus, even under Oregon's test, step two would be met.

to "create a maintenance manual and parts catalog for the S-61R, which aggravated the failure to manage the TC," and "informing the FAA that the S-61R helicopter requires a model gear box that does not exist and, even if it did exist, would not fit or be usable in the aircraft." ECF 8 at 11-12 (quoting Compl. ¶¶ 6, 19, 20, 27).

In response, Plaintiffs assert that the grounding of the Helicopter arises out of or relates to Sikorsky's affirmative conduct directed at Plaintiffs and the FAA in Oregon. ECF 13 at 20. Plaintiffs add:

> As the Type Certificate holder for the S-61R, Sikorsky has a responsibility for keeping the aircraft airworthy. In an effort to meet that obligation, Sikorsky has a field service representative, Mr. Tate, dedicated to responding to questions and requests regarding Sikorsky's helicopters in Oregon, including the N664Y Helicopter. (Pilon Dec., ¶ 8.) Sikorsky's Oregon field service representative, along with other Sikorsky employees, advised HTS that it could install either a -013 or a -019 MGB in the N664Y Helicopter. (Pilon Dec., ¶ 23, 27.) Based on Sikorsky's advice, RotorMaxx installed the -019 MGB in the N664Y Helicopter for HTS, which the FAA believed to be a -013 MGB. When an issue arose with the FAA, Sikorsky assured HTS that, "the team here at Sikorsky will help straighten this issue out [for] you." (Pilon Dec., ¶ 23, Ex. 6 at 4.)
>
> Despite its advice and assurances, Sikorsky then told the FAA that the N664Y Helicopter could only be fitted with a -017 or -018 model MGB. (Pilon Dec., ¶ 28.) Sikorsky's conflicting advice—which it purposefully directed towards HTS in Oregon and which the Court may reasonably infer that Sikorsky knew would go to the FAA in Oregon—caused the N664Y Helicopter to be grounded. Plaintiffs' claims "arise out of or relate to Sikorsky's actions directed at Oregon.["]

ECF 13 at 21.

Sikorsky replies:

> Sikorsky sold an airworthy helicopter over 40 years ago. Thereafter, the "owner or operator of an aircraft is primarily responsible for maintaining that aircraft in an airworthy condition . . . ." 14 C.F.R. § 91.403(a). The FAA had never approved the -019 MGB for use on the S-61R. No replacement

MGB was available. No regulation requires a Type Certificate holder to continue to manufacture replacement parts, let alone for decades after it stopped manufacturing that model. The grounding of the helicopter arose from this reality, not because Sikorsky informed the FAA that the -019 MGB had never been approved. Plaintiffs' claims were not caused by Sikorsky's communication with the FAA; the helicopter could not have been flown legally whether the FAA was informed or not. And none of these facts demonstrates that Sikorsky purposefully availed itself of the "privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws[.]" *Hanson*[, 357 U.S. at 253].

ECF 19 at 14-15 (footnote omitted).

The Court finds that Plaintiffs have sufficiently shown at this stage of the litigation, without considering the merits of the lawsuit, that but for the activities of Sikorsky's Robert F. Bellone and SCS's Gary Tate in providing advice and direction to Plaintiffs and the FAA in Oregon, the damages that Plaintiffs allege would not have occurred. Thus, Plaintiffs have met their burden at step two of the applicable three-part test. Finally, at the third step, the Defendant must come forward with a compelling case that the exercise of jurisdiction would not be reasonable. *Boschetto*, 539 F.3d at 1016. Defendant has not done so.

## CONCLUSION

Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (ECF 8) is DENIED. The parties are directed to confer regarding an appropriate case management schedule for this matter and to file not later than June 8, 2017, either a proposed stipulated case management schedule or each parties' respective proposed schedule.

**IT IS SO ORDERED**.

DATED this 23rd day of May, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge