# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **HELICOPTER TRANSPORT SERVICES, LLC, and U.S. LEASECO, INC.**, | Case No. 3:16-cv-2078-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **SIKORSKY AIRCRAFT CORPORATION**, | |
| Defendant. | |

Scott G. Seidman, Ryan M. Bledsoe, and Sarah M. Einowski, TONKON TORP LLP, 888 SW Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiffs.

Jonathan M. Hoffman and Michael A. Yoshida, MB LAW GROUP LLP, 117 SW Taylor Street, Suite 200, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiffs Helicopter Transport Services, LLC ("HTS") and U.S. Leaseco, Inc.

("Leaseco") (collectively, "Plaintiffs") bring this lawsuit against Defendant Sikorsky Aircraft

Corporation ("Sikorsky"). This dispute arises out of Plaintiffs' ownership and operation of a

Sikorsky-manufactured helicopter, which Plaintiffs have been unable to operate since 2012. In

their First Amended Complaint, Plaintiffs allege breach of implied-in-law contract (Count 1),

breach of implied-in-fact contract (Count 2), and breach of the implied warranty of

merchantability and fitness for a particular purpose (Count 3). Sikorsky moves for summary judgment. For the reasons that follow, Sikorsky's motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Summary judgment is not the time to amend pleadings. *See, e.g.*, *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (holding that when allegations are not in the complaint, "raising such claim in a summary judgment motion is insufficient to present the claim to the district court"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. LindWaldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)); *see also Pickern v. Pier I Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (new issues raised in response to summary judgment were not appropriate for consideration).

# BACKGROUND

Sikorsky designs, manufactures, and sells helicopters. In 1963, Sikorsky made and sold to a third-party a model S-61R helicopter, identified as Helicopter 61501 ("the Helicopter"). That Helicopter later was resold several times and eventually purchased by Plaintiff Leasco in 2000. In 2012, the Federal Aviation Administration ("FAA") refused to approve the Helicopter for flight, effectively grounding it. Plaintiffs have been unable to use the Helicopter since then.

## A. The Civilian Helicopter Industry

The Helicopter at issue is a "heavy-lift" helicopter, capable of holding significant weight. Heavy-lift helicopters frequently are used in the logging industry and in fighting forest fires. The FAA regulates both commercial and civilian aircraft. To legally operate a civilian helicopter, that helicopter must be approved and deemed "airworthy" by the FAA.

The FAA requires that all aircraft have a Type Certificate ("TC"), which indicates the airworthiness of an aircraft design or model. An aircraft's manufacturer usually holds the Type Certificate for that aircraft. Type Certificate holders create maintenance manuals, which are required by the FAA and guide owners, operators, engineers, and mechanics in maintaining the aircraft and keeping it airworthy by staying in compliance with FAA regulations. The maintenance, repair, and overhaul of aircraft is referred to in the industry as "MRO."

Generally, Type Certificate holders provide MRO support for even discontinued models of aircraft. A manufacturer's reputation with respect to its support for its aircraft, including older models, is often important to its ability to sell new models. Sikorsky provides MRO support and sells parts to owners and operators of its helicopters. Sikorsky has a program for its type-certificated helicopter models that provides MRO support and parts to owners and operators of those models. In the past, when Sikorsky has sold Type Certificates to other companies, it has

required that those companies or entities be a source for re-supply of parts, components, and accessories for those aircraft.

The Helicopter Association International ("HAI") is the leading trade association for owners and operators of helicopters. In 2004, the HAI issued a white paper noting that all of the "primary OEMs [original equipment manufacturers] maintain a significant number of dedicated staff within their 'product support engineering' organizations to provide expert technical assistance to the 'civil helicopter fleet.'" According to this report, OEM support for civilian helicopters "is a given, understood part of how the helicopter business is accomplished." This direct link between OEMs and helicopter operators, the report explained, "is a major element in insuring the 'continued airworthiness' of the fleet."

## B. History of the Specific Helicopter at Issue

Sikorsky manufactured the Helicopter at issue and first applied for FAA registration for the Helicopter in June 1963. The Helicopter is a model S-61R helicopter, which is part of Sikorsky's line of S-61 helicopters. The specific S-61R Helicopter at issue is listed on the 1H15 Type Certificate, which Sikorsky holds.

In December 1970, Sikorsky sold the Helicopter to Carson Helicopters, Inc. ("Carson"), under a written Conditional Sales Contract ("Carson Sales Contract"). Sikorsky sold the Helicopter used and in an "as is" condition. Under the Carson Sales Contract, Sikorsky and Carson acknowledged that Sikorsky would not provide or obtain an Airworthiness Certificate or a special flight authorization for Carson to remove the helicopter from Sikorsky's premises. The Carson Sales Contract also expressly noted that the aircraft, when delivered, would "not be in conformity with the FAA type certification basis applicable to the S61-R and FAA Type Certificate Number 1H15." Sikorsky expressly disclaimed all warranties, except for a warranty of good title and a warranty against patent infringement claims. The Carson Sales Contract also

provided that "all loss, liability and damage to persons or property arising out of the possession, regulations, requirements, and rules with respect to the use, operation, management, control and maintenance of the Helicopter" would fall on the buyer, Carson. Sikorsky's sale to Carson also included several components for the Helicopter, including a model S3167-23000-8 Main Gear Box ("-08 MGB"). In January 1971, the Carson Sales Contract was recorded in the FAA Registry.

After purchasing the Helicopter, Carson performed work on the aircraft, and the FAA thereafter issued a Standard Airworthiness Certificate on May 14, 1971. The Helicopter's logbooks indicate that Carson installed a -12 MGB in May, 1971, and then modified that to be a -13 MGB in November 1971.

The Helicopter changed hands two more times before entering Plaintiff Leaseco's possession. In January 1972, Carson sold the Helicopter to Grumman Aerospace Corporation ("Grumman"). In December 1995, Grumman resold the Helicopter to Blue Bird Helicopters ("Blue Bird"). On February 9, 2000, Plaintiff Leaseco purchased the Helicopter from Blue Bird as part of a larger purchase of several aircraft and other items of inventory and equipment. As was the case with Carson's purchase from Sikorsky in 1970 under the Carson Sales Contract, Leaseco purchased the used Helicopter from Blue Bird in 2000 on an "as is, where is" basis.

## C.  Plaintiffs' Operation and FAA's Grounding of the Helicopter

As the Type Certificate holder, Sikorsky owns the drawings for most of the parts, components, and accessories for the S-61 line of aircraft. Over the years, Sikorsky in various ways assisted Plaintiffs in their operation of the Helicopter and other aircraft. For example, Sikorsky Commercial Services, Inc. ("SCS"), a wholly-owned subsidiary of Sikorsky, employs Gary Tate as a Field Service Representative. Tate provides technical assistance with maintenance problems and serves as a liaison between Sikorsky and its customers. Tate assisted Plaintiffs on

at least six separate occasions, always at no charge to Plaintiffs. Tate also occasionally shared with Sikorsky information about issues gleaned from operators, which Sikorsky would use to update protocols for the maintenance, repair, or overhaul of aircraft. Plaintiffs also purchased parts from Sikorsky. HTS purchased at least $185,000 worth of parts from Sikorsky or Sikorsky affiliates for use mostly, if not exclusively, on aircraft other than the Helicopter. HTS also purchased an annual subscription to a Sikorsky website that allows aircraft operators to access Sikorsky's technical and maintenance manuals.

When Leaseco purchased the Helicopter from Blue Bird in February 2000, the Helicopter still had in it the -13 MGB that Carson installed. On September 25, 2012, David W. Knowles, Director of Maintenance for HTS' Heavy-Lift Division, emailed Gary Tate to inform him that he was "having some trouble with the FAA." As Knowles explained, the -13 MGB was not listed on the Type Certificate as approved for use with the CT-140-1 or -2 engines—the type of engine in the Helicopter. Tate responded that day, stating that a September 15, 1972 letter from Donald Baldwin, then the S-61 Commercial Coordinator with Sikorsky Aircraft's Product Support Department, was still in effect. That letter described the acceptable torque range limits on the Helicopter. The letter explained that the maximum input power that should be applied to the Helicopter's MGB depends on the specific configuration of the MGB itself. It noted that the -13 MGB that was then-installed in the Helicopter was configured to accept 2500 horsepower and provided the corresponding appropriate torquemeter ranges.

On September 28, 2012, Robert F. Bellone Jr., a SAS Fleet Technical Support Service Engineer with Sikorsky, reiterated to Knowles that Sikorsky "st[ood] behind the letter dated 15 September 1972." According to Bellone, the -13 MGB was "configured to accept the higher horse power when using CT58-140-1 engines." Bellone attached to his email a copy of an email

written by a Sikorsky representative in 2000, which stated that the -13 MGB was "compatible for use with the CT58-140 engine provided that the torque limitation[s] . . . are adhered to."

On October 4, 2012, Knowles emailed Tate to tell him that the FAA had informed Knowles that it was "not able to confirm the eligibility of [the -13 MGB] coupled with the GE CT 58-140-1 engines as currently installed in [the Helicopter]." On October 5, Knowles and Tate discussed setting up a telephone conference to discuss the eligibility of the installation of the S6137-23000 series MGB in the S61-R model, coupled with a CT-140-1 or -2 engine. Over the weekend of October 6-7, 2012, HTS installed a -19 MGB in the Helicopter. HTS purchased the MGB from RotorMaxx, an FAA-authorized MRO provider. Knowles informed Bellone of this change on October 11.

On Tuesday, October 9, 2012, Bellone told Knowles that Sikorsky's design engineering department was working on revising the TC to state that the 23000 series MGB is an applicable installation to the CT58-140-1 & -2 engines on the S-61R Model. After all of the necessary approvals were given internally, Bellone explained, the paperwork would go to Sikorsky's Civil Air Regulations ("CAR") office, which would contact the FAA about the change. Bellone told Knowles that he "personally fe[lt] the FAA [wa]s wrong, but [that] this change w[ould] spell it out once and for all." Knowles agreed that the FAA's interpretation of the TC was incorrect. On October 11, Bellone emailed Knowles to tell him that although the engineering department had created a revised copy of the TC, it had hit a "snag." Specifically, the drawing stated that 23000-11, -13, and -14 MGBs were not to be used in the Helicopter. Bellone assured Knowles that they were trying to get to the bottom of this "dilemma." Knowles wrote back later that day noting that the -13 had been installed in the Helicopter since Carson owned it, up until the weekend before, when HTS installed a -19 MGB.

On October 17, 2012, the FAA, through Erik Ramseyer, informed Knowles that Sikorsky and the FAA together had determined that the -17 and -18 MGBs in the 2300 series were approved with the CT 58-140-1 engine, but the -19 MGB was for military use only and may not be appropriate in the Helicopter, which was built for civilian use. On November 1, 2012, Bellone wrote to Knowles, stating that the S6137-23000-13 through -19 MGBs were approved for use with the CT58-140-1 engine.

On November 9, 2012, FAA employee Bill J. McKibbon sent an email to Knowles, informing him that only the -17 and -18 MGBs were approved for use in the Helicopter. McKibbon explained that this was based on the latest information received from the FAA's Boston Aircraft Certification Office ("ACO") and Sikorsky. Knowles forwarded this email to Bellone, expressing confusion over what had gone on internally at Sikorsky and over the fact that a 23000 series MGB that had been installed on the Helicopter for quite some time was now not included in the list of approved MGBs. Knowles also noted that there was "no published information outside of [the] Sikorsky engineering department" for the required MGBs, meaning that no vendor would be able to build or modify an MGB to meet the required specifications. Bellone explained that there had been internal disagreements at Sikorsky with respect to which MGBs were approved for use with the Helicopter and with the particular engine installed in the Helicopter.

After being informed that it could not operate the Helicopter with a -19 MGB, HTS had RotorMaxx convert the MGB to a -18 MGB. RotorMaxx did this by identifying relevant differences between the -18 and -19. Sikorsky and the FAA, however, still did not approve this conversion. Knowles is unaware, and Sikorsky has not argued, that -17 or -18 MGBs exist or

have ever existed as originally-manufactured components. Based on this action by the FAA, Plaintiffs have been unable to operate the Helicopter since 2012.

## DISCUSSION

Plaintiffs allege that by failing to manage the Type Certificate in such a way as to allow Plaintiffs to conform the Helicopter to the Type Certificate, and by making conflicting statements about the MGBs approved for use in the Helicopter, Sikorsky breached an implied-in-law contract, an implied-in-fact contract, the implied covenant of good faith and fair dealing, an express contract modified by custom and practice, and implied warranties.[1] The Court will first address Plaintiffs' theories of implied-in-fact contract and implied-in-law contract. The Court will then address Plaintiffs' theories of the implied covenant of good faith and modified express contract. Finally, the Court will address Plaintiffs' theory of implied warranty.

### A. Breach of Implied-in-Law Contract and Breach of Implied-in-Fact Contract

In their First Amended Complaint, Plaintiffs allege as Count One that Sikorsky breached an implied-in-law contract. An implied-in-law contract, or "quasi-contract," "is one that is created by the law for reasons of justice, without any expression of assent." *Staley v. Taylor*, 165 Or. App. 256, 262 (2000) (quoting 1 *Corbin on Contracts* § 19 at 46) (alteration omitted). This category "includes a variety of types of contractual obligations that are implied to prevent injustice." *Id*. To be precise, a quasi-contract is more a theory of recovery (specifically, a theory of restitution), than it is a type of contract. *See Fleming v. Wineberg*, 253 Or. 472, 482 (1969)

---

[1] The parties agree that Oregon law applies to this dispute. The parties also agree that the Uniform Commercial Code ("UCC"), which governs the sale of goods, *see* Or. Rev. Stat. ("ORS") § 72.1020, applies to Plaintiffs' breach of warranty claims. The parties disagree, however, about whether the UCC or Oregon common law applies to Plaintiffs' claims of breach of contract, which Plaintiffs argue are based primarily on an alleged agreement to provide *services*, rather than goods. The parties also agree that no material differences exist between the Oregon UCC and Oregon common law for purposes of this dispute.

("Restitution includes, but is not limited to, the subject area of 'quasi contracts.'") (quoting *Restatement of Restitution*, General Scope Note at 1, 2 (1936)).

Plaintiffs appear to base their allegation of an implied-in-law contract on the express Carson Sales Contract from 1970. As previously explained, in 1970 Siksorsky sold the used Helicopter to Carson under the Carson Sales Contract "as is." Plaintiffs, however, contend that the Carson Sales Contract "included" an implied-in-law promise to fulfill the necessary requirements to keep the Helicopter airworthy. When Leaseco bought the Helicopter, Plaintiffs allege, it became the successor-in-interest to all express and implied-in-law contracts between Sikorsky and Carson, and HTS, which leases the Helicopter, is an assignee of those contracts. The Court, however, finds in the Carson Sales Contract no implied-in-law obligation by Sikorsky to keep the Helicopter, which was sold "as is," airworthy.

Plaintiffs also allege that there is an implied-in-fact contract between the parties.

> An implied-in-fact contract is no different in legal effect from an express contract. The only difference between them is the means by which the parties manifest their agreement. In an express contract, the parties manifest their agreement by their words, whether written or spoken. In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. Other than questions of proof, the two types of contracts have the same legal effect.

*Staley v. Taylor*, 165 Or. App. 256, 262 (2000) (citing *Restatement (Second) of Contracts* § 4 comment a (1979)) (citations omitted). Plaintiffs base their implied-in-fact theory on industry custom and practice as well as on the parties' respective conduct. Specifically, Plaintiffs allege that it is the custom and practice in the helicopter industry for the TC holder to be responsible for advising owners and operators on how to keep an aircraft airworthy, and to be the primary source for parts and accessories. Plaintiffs also allege that it is the duty of the TC holder to create and update the required maintenance manuals. Plaintiffs argue that, based on this industry custom

and practice, as well as the conduct of the parties conforming to that practice, the parties manifested an intent to be bound by an implied-in-fact contract under which Sikorsky would manage its TC in such a way as to allow Plaintiffs to keep their Sikorsky helicopters airworthy.

Sikorsky argues that Plaintiffs cannot establish any implied contract, either in law or in fact, because the parties have an express contract—the Carson Sales Contract—covering the relevant subject matter. In response, Plaintiffs argue that it is not the *Carson*-Sikorsky contract that controls this dispute, but some implied-in-law and implied-in-fact contractual obligations between *Plaintiffs* and Sikorsky. The problem for Plaintiffs, however, is that—at least in Count One—they expressly pleaded that Sikorsky breached a contract between Sikorsky and Plaintiffs *as successors-in-interest and assignees* to the Carson Sales Contract. Plaintiffs assert that the Carson Sales Contract "included" an implied-in-law promise—suggesting that both an express and implied-in-law contract were formed at the time of the sale between Sikorsky and Carson.

An implied-in-law contract, however, is implied only to prevent unjust enrichment by one party *in the absence of* an express contract governing the subject matter. It is well established that if a dispute is governed by an express contract, then the terms of that contract control. *Porter Const. Co. v. Berry*, 136 Or. 80, 84-85 (1931) (noting "that there can be no implied contract where there is an express contract between the parties in reference to the subject-matter"). Both parties rely on *Doughty v. Oregon Health and Sciences University*, 2017 WL 1364208 at *6 (D. Or. April 11, 2017). The court in *Doughty* stated that "when there is no dispute that an express contract covers the issue and the parties merely disagree regarding the interpretation of the contract, the plaintiff may not maintain the quasicontractual claim even on an alternative basis." Based on this, Plaintiffs argue that it is only when there *is no dispute* that an express contract governs an issue and the parties merely disagree over interpretation, that a party is foreclosed

from pursuing implied contract claims. *Doughty*, however, involved a motion to dismiss, and thus does little to aid Plaintiffs' case at this stage of the proceedings.

As the Oregon Court of Appeals explained:

> It is proper for a party to plead counts in contract and in Quantum meruit [an implied-in-law contract] covering the same course of events in [*sic*] complaint. Such alternative pleading may be beneficial to the pleader in the situation where it is faced with a contract which may be void under the statute of frauds, where its performance has been hindered by the defendant, where the facts at trial may show that it did not substantially perform the contract but that it is entitled to the reasonable value of the services furnished, or where the pleader is unsure of whether it can actually prove the existence of the contract at trial. . . . *Ultimately, however, there can not be a valid legally enforceable contract and an implied contract covering the same services. The contract controls*.

*Kashmir Corp. v. Patterson*, 43 Or. App. 45, 48 (1979), *aff'd*, 289 Or. 589 (1980) (citations omitted) (emphasis added). Thus, if the express contract between the parties[2] governs the subject matter of this dispute, then—although Plaintiffs may have properly *pleaded* in the alternative breach of both express[3] and implied contracts—the express contract will control, because "ultimately there cannot be a valid legally enforceable contract and an implied contract covering the same services." *Prestige Homes Real Estate Co. v. Hanson*, 151 Or. App. 756, 762 (1997); *see also U.S. for Use of Westinghouse Elec. Supply Co. v. Ahearn*, 231 F.2d 353, 356 (9th Cir. 1955) ("The terms of the express contract control. There cannot be an implied contract either in law or in fact contrary in terms to a controlling express contract."); *Mosier v. Stonefield*

---

[2] Plaintiffs assert in their First Amended Complaint that they were successors and assignees, respectively, to the Carson Sales Contract. Neither party disputes that HTS, Leaseco, and Sikorsky are all properly considered successor "parties" to the Carson Sales Contract for purposes of the Court's analysis.

[3] In fact, Plaintiffs did not actually use such expressly alternative pleading. Plaintiffs' First Amended Complaint identifies three counts: breach of implied-in-law contract, breach of implied-in-fact contract, and breach of implied warranties.

*Josephson, Inc.*, 815 F.3d 1161, 1172 (9th Cir. 2016) ("As a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights.") (quoting *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.,* 94 Cal. App. 4th 151, 172 (2001)).

Plaintiffs argue, relying again on *Doughty*, that an express contract governs the subject matter of a dispute only if the implied contract's enforceability necessarily depends upon the existence of the express contract or is based exclusively on the terms of the express contract. Thus, Plaintiffs contend, because the enforcement of some "Plaintiffs-Sikorsky contract" is not dependent upon the existence of or based exclusively on the terms of the Carson Sales Contract, [4] the express contract does not control. Plaintiffs misread *Doughty*.

The court in *Doughty* noted:

> [T]he basis for Plaintiff-Relators' claims for payment by mistake and unjust enrichment arise from the express contracts the government alleged in its Complaint. In fact, Defendant could only have been enriched unjustly and payments to Defendant could only have been mistaken if the express contracts did not set out specific rates and methods for charging costs. Indeed, Plaintiff-Relators incorporate by reference all of the allegations in the Complaint relating to the express contracts that form the basis for their FCA claims against Defendant and do not allege any other basis for unjust enrichment or payment by mistake.

*Doughty*, 2017 WL 1364208 at *7. The court in *Doughty* concluded that under these circumstances, the two contracts necessarily covered the same subject matter. This statement in *Doughty* does not, however, mean that this is the *only* situation in which an express and implied contract can be deemed to cover the same subject matter. The issue here is whether, under the

---

[4] Plaintiffs provide no persuasive argument in support of this statement. One might argue that some "Plaintiffs-Sikorsky contract" *is* dependent upon the Carson Sales Contract—Plaintiffs would have no need for Sikorsky's services, with respect to the Helicopter, if Plaintiffs had never acquired the Helicopter—which would not have happened but for Sikorsky selling the Helicopter to Carson. But that is not what Plaintiffs allege, nor would it aid Plaintiffs.

facts of this case, the Carson Sales Contract covers the same services or obligations for which Plaintiffs seek to hold Sikorsky to under Plaintiffs' implied contract theories.

In its First Amended Complaint, Plaintiffs allege that Sikorsky breached its contractual obligations by: (1) failing to manage the TC in such a way as to allow Plaintiffs to conform the Helicopter to the TC; (2) amending the TC; (3) not providing a conforming MGB or schematics for such an MGB; (4) failing to create a maintenance manual or parts catalog for the S-61R model helicopter; (5) failing to re-supply parts, components, and accessories; and (6) providing conflicting statements to the FAA. ECF 29, ¶¶ 6, 21, 27 (First Amended Complaint). These allegations, however, are all part of the same "subject matter" of the alleged implied-in-law and implied-in-fact contracts between Plaintiffs and Sikorsky and the express contract between Carson and Sikorsky to which Plaintiffs are successors.

The Carson Sales Contract provided for the sale of the Helicopter to Carson and described the attendant obligations and responsibilities of the buyer and seller. The Helicopter was sold in an "as-is" condition, without an airworthiness certificate and in non-compliance with the applicable Type Certificate. Under that express contract, the buyer (Carson) agreed "to obtain and maintain any and all required FAA licenses, registrations and certificates." ECF 40-2 at 11. The buyer also agreed to "comply with, or cause to be complied with, all applicable laws, ordinances, regulations, requirements and rules with respect to the use, operation, management, control and maintenance of the Helicopter" and to "comply with, or cause to be complied with, all licenses, permits and certificates issued to the Buyer relating to the Helicopter." ECF 40-2 at 11. The buyer also agreed, at its own cost and expense, to "service, repair and maintain the Helicopter so as to keep it in good operating condition," which includes "overhaul, replacement and installation of components in accordance with current recommendations for such work by

the Seller (Sikorsky), as stated in the Seller's overhaul manuals, service bulletins, or otherwise, and to furnish the mechanics, services and facilities to accomplish such work." ECF 40-2 at 11. The seller expressly assumed "no liability of any nature or kind for the performance, use or operation of the Helicopter." ECF 40-2 at 13.

Plaintiffs' alleged implied contracts cover the same subject matter as the Carson Sales Contract. The two "contracts" relate to the same piece of equipment (*i.e.*, the Helicopter), and to the respective responsibilities of the seller and the buyer, or—in this case—to the buyer's successors or assignees. More precisely, the "contracts" also both relate to Sikorsky's continuing obligation (or lack thereof) to ensure the Helicopter's airworthiness or conformance with the TC; to maintain or service—or incur costs to maintain or service—the Helicopter; to ensure that the Helicopter complies with all applicable rules and regulations; and to be liable for the performance or operation of the Helicopter. Viewing these two sets of alleged obligations together, the express contract and alleged implied contracts relate to the same subject matter. This conclusion applies equally to Plaintiffs' claims of an implied-in-law contract and an implied-in-fact contract, because both Count One and Count Two seek to impose substantially similar duties on Sikorsky.

The only allegation in Count One that might be construed as alleging an implied-in-law contract, and which might not be governed by the express Carson Sales Contract, is contained in Paragraph 23, in which Plaintiffs allege that they expended significant costs in replacing the MGB in reliance on advice from Sikorsky that later turned out to be incorrect and to render the Helicopter nonconforming to the Type Certificate. Although this could possibly state a claim for an implied-in-law contract, there is ultimately no evidence to support Plaintiffs' assertion that

Plaintiffs replaced the MGB *based on Sikorsky's advice*. The undisputed evidence is, in fact, to the contrary.

Plaintiffs point to Mr. Bellone's November 1, 2012 statement to HTS, which Mr. Perschbacher later retracted, that HTS could install any one of the -13 through -19 MGBs in the S-61R Helicopter. Plaintiffs argue that in reliance on Mr. Bellone's initial statement, they installed the -19 MGB that turned out to be unapproved. Bellone also wrote to Knowles on Tuesday, October 9, 2012, saying that the 23000 series MGB was an applicable installation with the CT 58-140-1 and -2 engines on the S-61R model helicopter—which would that *any* MGB in that series was acceptable. The undisputed evidence shows, however, that HTS had *already* installed the -19 MGB—on October 6 or 7—*before either of these communications from Sikorsky occurred*. Thus, there is no genuine dispute showing that HTS relied on Sikorsky's advice in installing the -19 MGB.

Further, neither party has asserted that the Carson Sales Contract is unenforceable for any reason. Plaintiffs allege in their First Amended Complaint, in fact, that they are successors and assignees, respectively, to the Carson Sales Contract, and that all conditions precedent have occurred.[5] Thus, the parties' dispute is governed by the terms of the express contract—the Carson Sales Contract. There can, however, be no implied contract when an express contract governs the same subject matter, which is the case here.

---

[5] Although Plaintiffs now argue that this lawsuit is "driven by" a contract other than the Carson Sales Contract, Plaintiffs' First Amended Complaint—at least in Count One—is expressly predicated on the Carson Sales Contract. Plaintiffs allege that the parties are bound by that contract and that an implied-in-law promise was "included" in the Carson Sales Contract. In *Kashmir*, the Oregon Court of Appeals concluded that when a plaintiff "pleaded and . . . incorporated [the express contract] in plaintiff's complaint" and the "[d]efendants admitted the contract in their answer[,] [t]he enforceability of the contract was not in dispute." *Kashmir*, 43 Or. App. at 48.

**B.  Breach of Implied Covenant of Good Faith and Breach of Modified Express Contract**

Plaintiffs captioned their first count as one for breach of implied-in-law contract, but the body of that count also alleges a claim for breach of express contract and breach of the implied covenant of good faith and fair dealing. In Oregon, "every contract contains an implied duty of good faith." *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp*., 320 Or. 638, 645 (1995). That duty is meant to effectuate the objectively "reasonable contractual expectations of the parties." *Id*. (quotation marks omitted). Its purpose is also "to prohibit improper behavior in the performance and enforcement of contracts, and to ensure that the parties 'will refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Klamath Off–Project Water Users, Inc. v. Pacificorp,* 237 Or. App. 434, 445 (2010) (citation and quotation marks omitted). "[T]he duty of good faith and fair dealing involves industry standards and practices that attach to agreements entered into by the parties." *Iron Horse Engineering Co. v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 420 (2004).

The duty of good faith, however, may not "vary the substantive terms of [a] bargain," nor "provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract." *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp*., 320 Or. 638, 645 (1995) (quotation marks and alterations omitted); *see also Klamath Off-Project Water Users*, 237 Or. App. at 445 (noting that the duty may not "contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract"). The duty of good faith "may be implied as to a disputed issue only if the parties have not agreed to an express term that governs that issue." *Ore. Univ. Sys. v. Ore. Public Employees Union, Local 503*, 185 Or. App. 506 , 570 (2002). In such a case, "the reasonable expectations of the parties are irrelevant." *Id*.

Plaintiffs argue that Sikorsky breached the implied covenant of good faith and fair dealing by complying with industry standards and practices for more than a decade and then ignoring them in dealing with the issue with Plaintiffs' Helicopter. Plaintiffs argue that industry custom and practice requires Sikorsky, as the holder of the 1H15 Type Certificate, to support the S-61 helicopters, be the direct source for re-supply of parts, components, and accessories for those helicopters, and provide parts and support for owners and operators of those helicopters.

Specifically, Plaintiffs argue that two sections in the Carson Sales Contract, sections nine and ten, imply a duty on Sikorsky's part to aid Plaintiffs in keeping the Helicopter airworthy and resupplying parts. In section nine, the purchaser agreed "to use such Helicopter only for lawful purposes and at all times in accordance with FAA regulations (and to obtain and maintain any and all required FAA licenses, registrations and certificates) and all applicable United States laws, rules and regulations . . ." ECF 40-2 at 11. In section ten, the purchaser agreed to:

> [A]t [their] own cost and expense, service, repair and maintain the Helicopter so as to keep it in good operating condition, including overhaul, replacement and installation of components in accordance with current recommendations for such work by [Sikorsky], as stated in [Sikorsky's] overhaul manuals, service bulletins, or otherwise, and to furnish the mechanics, services and facilities to accomplish such work"

ECF 40-2 at 11. The purchaser also agreed to "pay all costs and expenses of any parts and accessories for replacement, including transportation charges and taxes thereon."

Plaintiffs argue that they are unable to use the Helicopter in accordance with FAA regulations or to obtain and maintain required licenses, registrations, and certificates, as called for in section nine, because Sikorsky failed to comply with industry custom and practice and the parties' course of dealing. Plaintiffs also argue that sections nine and ten of the Carson Sales Contract would not make sense if there were not an understanding that Sikorsky would continue to supply necessary parts and maintain the Type Certificate in such a way as to allow a purchaser

and its successors to operate the Helicopter. Plaintiffs argue that in this respect Sikorsky breached the express terms of the contract as well as the its implied covenant of good faith and fair dealing.

The parties agree that the express terms of the contract may be explained or supplemented by course of performance, course of dealing, or usage of trade. *See* ORS § 72.2020. That does not mean, however, that the express terms may be *contradicted* by such evidence. Similarly, although industry custom and practice form a part of the covenant of good faith and fair dealing, the Court may only hold a party to that industry custom or practice if doing so "effectuates the reasonable contractual expectations of the parties," *Iron Horse Engineering Co.*, 193 Or. App. at 421 (holding the parties to industry standards and practices because, in that case, doing so effectuated the parties' reasonable contractual expectations), and does not "vary the substantive terms of [a] bargain," *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 645 (1995). Sikorsky argues that Plaintiffs' interpretation of the Carson Sales Contract and of the implied duty of good faith and fair dealing contradict the express terms of the Carson Sales Contract and the objectively reasonable expectations of the parties to that contract.

Sikorsky, as the holder of the Helicopter's type certificate, has a role to play in the FAA's approval process for the Helicopter. Thus, section nine, in which the purchaser agreed to use the Helicopter in accordance with FAA Regulations, could be read to imply some duty on Sikorsky's part to work in a reasonable manner with the FAA, and to avoid rendering a purchaser or its successors unable to fulfill their own duties under the contract. Similarly, section ten, in which the purchaser agrees to maintain the Helicopter in accordance with Sikorsky's recommendations, suggests that Sikorsky has a duty to act reasonably in making such recommendations.

As discussed above, however, the Carson Sales Contract expressly sold the Helicopter "as is," without an airworthiness certificate and out of compliance with the Type Certificate. As expressly stated in the Carson Sales Contract, Sikorsky assumed "no liability of any nature or kind for the performance, use or operation of the Helicopter." All responsibility for repairing and maintaining the Helicopter was placed in the buyer's hands. Accordingly, in light of these express waivers and disclaimers, no reasonable jury could conclude that it was the objectively reasonable expectation of the parties at the time of signing the Carson Sales Contract that Sikorsky could later be held responsible for failing to provide parts or other services required to keep the Helicopter airworthy and in compliance with FAA requirements. Rather, Sikorsky sold the Helicopter in an "as is" condition and with no guarantees about future airworthiness. Thus, the contract cannot be read to impose on Sikorsky the duties for which Plaintiffs now seek to hold Sikorsky responsible.

## C. Breach of Implied Warranty

Count Three in Plaintiffs' First Amended Complaint, alleging breach of implied warranty, is expressly based on Sikorsky's "sale of helicopters," each of which, Plaintiffs allege, contains an implied warranty of merchantability and fitness for a particular purpose. Because Plaintiffs' claim for breach of implied warranties is based on Sikorsky's sale of the Helicopter, it is governed by the written Carson Sales Contract.

Under the UCC, and Oregon law,

> Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.

ORS § 72.3160(3)(a); *see also* UCC § 2-316(3)(a).

Furthermore,

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

ORS § 72.3160(3).

The Carson Sales Contract, under which Sikorsky sold the Helicopter in 1970, expressly disclaims any warranties, including implied warranties. The contract states, twice, that the helicopter is sold "AS IS." ECF 40-2 at 1, 9. The following limitation also appears:

> THE HELICOPTER IS SOLD "AS IS" AND THE FOREGOING WARRANTY OF TITLE AND OF PATENT INFRINGEMENT ARE GIVEN AND ACCEPTED IN LIEU OF ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTY OF MERCHANTABILITY. THE REMEDIES OF THE BUYER FOR ANY BREACH OF WARRANTY SHALL BE LIMITED TO THOSE PROVIDED HEREIN TO THE EXCLUSION OF ANY AND ALL OTHER REMEDIES INCLUDING, WITHOUT LIMITATION, INCIDENTAL OR CONSEQUENTIAL DAMAGES. NO AGREEMENT VARYING OR EXTENDING THE FOREGOING WARRANTIES, REMEDIES, OR THIS LIMITATION, WILL BE BINDING UPON SELLER UNLESS IN WRITING, SIGNED BY A DULY AUTHORIZED OFFICER OF SELLER.

ECF 40-2 at 9.

As Sikorsky points out, the Carson Sales Contract also did not contain any "promises or puffery" attesting to the quality or longevity of the Helicopter. Rather, Sikorsky sold the Helicopter "as is," not conforming to a Type Certificate, without an airworthiness certificate or special flight authorization, and with the understanding that it was Carson's responsibility thereafter to render the Helicopter airworthy. The Carson Sales Contract expressly and

adequately disclaimed all warranties other than those expressly provided for in the contract.

Further, the disclaimer, in all capital letters, was conspicuous. *See Duyck v. Nw. Chem. Corp.*, 94

Or. App. 111, 115-16 (1988) ("Language in the body of a form is conspicuous if it is in larger or

other contrasting type or color.") (quotation marks omitted).

Further, Plaintiffs also argue that their implied warranty claim arises from Sikorsky's sale

of *manuals* to HTS, not from (or merely from) Sikorsky's sale of the Helicopter itself. The

parties dispute whether the warranty waivers in the Carson Sales Contract apply to manuals for

the Helicopter, including those later sold to Plaintiffs. Regardless of this dispute, however,

Plaintiffs' argument is belied by the text of Plaintiffs' First Amended Complaint, which alleges:

> Each of Sikorsky's sales of helicopters contains an implied
> warranty of merchantability and fitness for a particular purpose.
> Specifically, each sale carries with it the implied warranty that
> Sikorsky will do what the FAA requires of manufacturers of
> aircraft to allow the aircraft to be operated for commercial use.

ECF 29 ¶ 39. Plaintiffs then allege that Sikorsky breached those implied warranties.

Plaintiffs now argue that they are bringing claims for the sale of defective manuals. This

is wholly unrelated to the claims actually pleaded in Plaintiffs' First Amended Complaint.

Summary judgment, however, is not the proper place or time to add new claims. *Navajo Nation*,

535 F.3d at 1080 (holding that when allegations are not in the complaint, "raising such claim in a

summary judgment motion is insufficient to present the claim to the district court"). It also is not

clear how a warranty *on the Helicopter* could arise out of a sale of a manual. Any implied

warranty arising from the sale of the manual would be a warranty on *that manual*, not on some

other good. The breach that Plaintiffs allege is of a warranty *on the Helicopter* and of an implied

promise to do what it takes to keep the Helicopter operable. In effect, Plaintiffs are attempting to

convert a warranty associated with the sale of a manual *into* a warranty on the Helicopter—the

very thing that Sikorsky disavowed when it sold the Helicopter.

Finally, Plaintiffs argue that if Sikorsky did not have a legal obligation to update its maintenance manuals and provide continued support to Plaintiffs, it would not have done so. But this flies in the face of Plaintiffs' other theory—that no one would buy Sikorsky aircraft if Sikorsky did not offer services to help keep aircraft airworthy over time. As Sikorsky argues, the fact that Sikorsky chooses to do something to improve its business prospects and reputation does not mean that it is necessarily under any legal obligation to do so or to continue to do so.

## CONCLUSION

Sikorsky's motion for summary judgment (ECF 37) is GRANTED, and Plaintiffs' claims are dismissed.

**IT IS SO ORDERED**.

DATED this 23rd day of March, 2020.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge